UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

LAWRENCE MIKEL,

                  Petitioner,

    -vs-

ANTHONY F. ZON, Superintendent of
Wende Correctional Facility,

              Respondent.
_____

**REPORT AND RECOMMENDATION
No. 04-CV-6448(CJS)(VEB)**

## I.    INTRODUCTION

Petitioner Lawrence Mikel ("Mikel"), represented by counsel, has filed a timely petition

for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in New York

State Supreme County (Monroe County) on two counts each of murder in the second degree

(N.Y. Penal Law § 125.25(1), (3)) and grand larceny in the fourth degree (N.Y. Penal Law §

155.30(5)); eleven counts of robbery in the first degree (N.Y. Penal Law § 160.15(1), (2), (4));

and four counts of criminal possession of a weapon in the second degree (N.Y. Penal Law §

265.03). District Judge Charles J. Siragusa has referred this matter to the undersigned for the

issuance of a Report and Recommendation regarding the disposition of Mikel's petition.

## II.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On the night of October 30-31, 1991, Terry Floyd ("Floyd") and Mary Adamski

("Adamski") were robbed and shot by three assailants in two separate and unrelated incidents in

the City of Rochester. That night, Mikel and his uncle, Jerwie Richardson, and Lawrence

Copeland were driving around, looking for victims to rob. Richardson's girlfriend, Dunya

Johnson ("Johnson"), was driving the car. Floyd, the first victim, was found dead not long after

the robbery; he had been beaten, strangled, and shot in the face. Adamski was the next victim;

after stealing her purse and jacket, Mikel put a gun to the back of her head and shot her.

Although Adamski was not killed instantly, she was rendered a quadriplegic and unable to

breathe on her own. After spending seven weeks in the hospital, Adamski was removed from life

support and died immediately thereafter. Mikel and his co-defendants were arrested in

connection with these crimes. Mikel waived his constitutional rights and gave a written statement

on May 20, 1992, admitting his participation in the two robberies. (Mikel was incarcerated at the

time, serving a sentence for a prior unrelated conviction.) In the statement, he acknowledged he

had a sawed-off shotgun that night, but stated that Richardson was person who shot both the

victims. *See* Respondent's Exhibit S at 317-32. These statements were held to be admissible at

trial. Mikel and Richardson were jointly indicted; Copeland was indicted separately.

In late 1994, Mikel and the co-defendants were tried in a multiple jury trial[1] in Monroe

County Supreme Court (Mark, J.). Johnson, the driver, testified for the prosecution under a grant

of immunity. Mikel and Richardson were convicted, but Copeland was acquitted. Mikel and

Richardson's convictions, however, were reversed upon direct appeal because the trial court had

submitted an annotated verdict sheet to jury which identified distinguishing characteristics of the

indictment counts. *See People v. Mikel*, 237 A.D.2d 982, 982, 654 N.Y.S.2d 907 (App. Div. 4th

Dept. 1997) (citations omitted). Mikel and Richardson were re-tried in July of 1997, again before

Justice Mark in Monroe County Supreme Court in a multiple jury trial. On the second day of jury

deliberations in Mikel's case, it was revealed that one juror had lied during *voir dire* about

---

[1]     A multiple jury trial uses separate juries–one for each defendant.

whether she had a relative who had been convicted of a crime. The issue, which involved Juror

Pearce, came to light on July 26, 1997, when a juror approached the court. Out of the presence of

Mikel, but with the prosecutor and defense counsel presence, the juror stated,

> When we were discussing yesterday the statement [of petitioner] we arguing over – well, she brought up – Sharon [Pearce] brought up she knew somebody that she felt got convicted falsely by a statement or something, and I don't know if that was the – discussed during the jury selection or stuff like that, but stuff like that was asked.

T.23; E.42. The trial court then called in Juror Pearce, and the following colloquy ensured among

the judge, the juror, the attorney, and the defendant:

| | |
|---|---|
| The Court: | Hi, Miss Pearce. We have information that you knew someone who you feel was wrongly convicted of a crime because of a confession that was obtained from him, is that correct? |
| Juror Pearce: | I didn't say it quite like that. I was taking into consideration that the way his statement was taken that he didn't fully understand that if he confessed that he was giving up his rights and that it can be used against him. And I was trying to understand was he aware of that or I mean why would he – if he was aware of that why would he confess to that? Am I making myself clear? |
| The Court: | Are you talking about – |
| Juror Pearce: | I'm talking about – |
| The Court: | Talking about this case or your friend? |
| Juror Pearce: | Talking about the statement in this case. |
| The Court: | Apparently you made a statement to the effect that you knew someone who had been illegal [sic] convicted. |
| Juror Pearce: | That's not affecting my decision. |
| The Court: | Who was this individual? |
| Juror Pearce: | My brother. |
| The Court: | And how long ago was that? |
| Juror Pearce: | Thirteen years ago. |
| The Court: | What was he convicted of? |
| Juror Pearce: | Murder. |
| The Court: | Was that in this area? |
| Juror Pearce: | You mean in Rochester? Yes. |
| The Court: | Did he go to trial? |

| | |
|---|---|
| Juror Pearce: | Yes. |
| The Court: | Did you attend the trial? |
| Juror Pearce: | No. I was – my mother didn't allow us to go. |
| The Court: | And somehow you received information that he had confessed? |
| Juror Pearce: | No. |
| The Court: | He had not confessed? |
| Juror Pearce: | No. I mean what does that have to do with this case? I mean I was pointing out to them that we all were talking about certain things. I just brought that point up. |
| The Court: | Let's get back to your brother. One of the questions I asked you was if you knew anybody convicted of a crime. |
| Juror Pearce: | Yes. |
| The Court: | You answered "no". |
| Juror Pearce: | Did I answer "no"? |
| The Court: | I mean earlier, when you were in the jury box, I asked all the jurors the question if you or anyone close [to] you had been arrested for, charged with, or convicted of a crime and you didn't answer me.[2] |
| Juror Pearce: | I didn't answer? |
| The Court: | No. And then Mr. Strazzeri [the prosecutor], I think in his follow up, asked if anybody ever visited a jail. Did you ever visit him in jail? |
| Juror Pearce; | No all the time but sometimes. |
| The Court: | You didn't answer that question either. |
| Juror Pearce: | I didn't? |
| The Court: | You didn't. |
| Juror Pearce: | I mean I don't recall. |
| The Court: | We'll assume that you answered "no" to both questions. Can you tell us why? |
| Juror Pearce: | I don't think that it was important. It didn't affect my judgment. |
| The Court: | Getting back to the question, that's why we ask you these question. When we're asking those prospective jurors -- |
| Juror Pearce: | I'm not sure why I didn't answer. I don't really talk about him. |
| The Court: | Did your brother confess to the police? |

---

[2]     During *voir dire*, the trial court addressed the following question to the group of potential jurors which included Juror Pearce: "The next question, again you may want to answer in private if it is applicable: Has any one of you or anyone close to you been arrested for, charged with, or accused of the commission of any type of crime? Does that apply to anybody?" T.190. Immediately thereafter, seven prospective jurors approached the bench and informed the trial court of their prior convictions. Of course, the colloquies occurred out of Juror Pearce's hearing, but she nevertheless saw a number of other jurors affirmatively respond to the judge's question.

| | |
|---|---|
| Juror Pearce: | No that I know of. |
| The Court: | So why do you feel he was illegally convicted? |
| Juror Pearce: | Because he told me. He told me about things. He didn't tell me about the case, but I mean he didn't do anything and I believe him. |
| The Court: | So you think he was illegally convicted because he told you he didn't do anything. You don't think the police did anything wrong? |
| Juror Pearce: | *They did a lot of things wrong*. When they came to our house to look for him – they didn't come to our house to look for him but came to look for another person and then that person was hiding in our house and my mother told them, well, you have to go downtown and get a warrant and police asked him – my mother told him – because he was hiding upstairs in our room, and my mother told the police, without talking him into coming out, so he did. Then the police officer asked her, well, we want to talk to your son, too. And she said, why you want to talk to him? Police said, we just want to question him. And they said – she said, where at? And he said, in the police car. And questioned him in the police car and we never seen [sic] him again. And we tryin' [sic] to get an appeal now but – they will take it so far and gets knocked back down. |
| The Court: | What do you feel the police did illegally in your brother's case? |
| Juror Pearce: | Said they read him his rights at our house and they didn't. And lawyer asked – he didn't want us to testify because he said that me and my sister was too young to testify because they don't – jury will believe that we were lying for him because he is our brother, but we know to this day that they did not come there to arrest by brother for anything. |
| The Court: | Is there any reason you can't be a fair and impartial juror? |
| Juror Pearce: | I'm being impartial. |
| The Court: | Don't you think your brother's experience will prevent you from being a fair and impartial juror? |
| Juror Pearce: | No. |
| The Court: | Mr. Strazzeri? |
| Mr. Strazzeri: | Miss Pearce, you remember you swore to tell the truth when you were – during jury selection, is that right? |
| Juror Pearce: | Yes. |
| Mr. Strazzeri: | And at that time you were aware of the fact your brother had been convicted of murder by the Monroe County DA's office, right? |

| | |
|---|---|
| Juror Pearce: | Yes. |
| Mr. Strazzeri; | Didn't see fit to tell us that? |
| Juror Pearce: | No. |
| Mr. Strazzeri: | You knew you had an allegation of misconduct by the police department, Rochester Police Department. You considered what they did to be illegal in your brother's case, right? |
| Juror Pearce: | Yes. |
| Mr. Strazzeri: | Remember the Judge asking you is there any reason you can't be a fair and impartial juror? |
| Juror Pearce: | I remember that. |
| Mr. Strazzeri: | Did it occur to you that perhaps that is something you should bring to our attention. |
| Juror Pearce: | Not at that time. I really didn't think that you people – I didn't think I would be picked. |
| Mr. Strazzeri: | But you were picked and when you were picked you had these facts in your knowledge, right? |
| Juror Pearce: | That my brother was in prison? |
| Mr. Strazzeri: | And under appeal right now. |
| Juror Pearce: | It's not under appeal. We're looking for a lawyer. |
| Mr. Strazzeri: | Looking into appeal? |
| Juror Pearce: | Yes. |
| Mr. Strazzeri: | *You're not telling us that you forgot about this during jury selection. You chose not to tell us.* |
| Juror Pearce: | *Right.* |
| Mr. Strazzeri: | Thank you. |
| The Court: | Mr. Thompson [defense counsel]? |
| Mr. Thompson: | Just a couple. Miss Pearce, you knew about this. Why did you choose not to mention it? |
| Juror Pearce: | Because I didn't think that it was important. |
| Mr. Thompson: | Did you think that it would have any impact on your ability to sit as a fair or impartial juror? |
| Juror Pearce: | No. |
| Mr. Thompson: | Did you think it would influence your ability to be fair to either the defendant or prosecution in this case? |
| Juror Pearce: | Yes. |
| Mr. Thompson: | You think it would influence your ability? |
| Juror Pearce: | What you [sic] mean influence? That my brother -- |
| Mr. Thompson: | Fact your brother was convicted and fact that you had this complaint about the wrongful police conduct, you think – did you think at the time that you were being questioned, at the time of jury selection, that that would have any impact on your ability to sit as a fair an impartial juror in this case? |

| | |
|---|---|
| Juror Pearce: | No. |
| Mr. Thompson: | Do you think so, now? |
| Juror Pearce: | No. |
| Mr. Thompson: | Nothing further. |

Excerpt of *Voir Dire*, attached as an Exhibit to Petition (Docket No. 1) at E.51-E.59.[3] At that

point, Juror Pearce was excused and told to return to the jury room, and the discussion continued

between the trial court and counsel. The prosecutor noted that this was "the most outrageous

example of juror misconduct" he had ever encountered in his twelve-year career and that the

juror "knowingly perjured herself during the course of jury selection." H.33-34 (E.59-60). The

prosecutor argued that Juror Pearce was "clearly a biased juror" and "should have been struck for

cause" based on "these predispositions or feelings." Defense counsel argued that Juror Pearce

"answered pretty clearly" that she was able to consider the evidence in the case and that her

experience with her brother's arrest and conviction "would not impact on her ability to sit fairly."

He noted that she "was simply willing to consider the possibility that a confession might, in fact,

be coerced." E.61.

　　The trial court then issued its ruling: "The juror, Miss Pearce, clearly indicated that she

fabricated her answers to two questions. Court finds her grossly disqualified to continue in the

jury room." E.62. Defense counsel, at that point, asserted that Juror Pearce "didn't fabricate. She

didn't respond. Didn't answer 'no'. . . . She didn't respond at all" to the court's question "if she

or anyone close to her had ever been convicted of a crime[.]" E.62. As the prosecutor pointed

out, Juror Pearce "[k]nowingly" did not respond. *Id.* The trial court reiterated its ruling: "Fact

remains she did not honestly respond to the questions and the Court finds her grossly unqualified.

---

[3]　　　　Citations to pages in this exhibit will be as follows: "E.__".

This trial is declared [sic]." E.63.[4] The mistrial was declared over defense counsel's objection.  A mistrial must be declared when it is a "physical impossibility" to continue the trial.[5]  At Mikel's trial, no alternate juror was available to serve in the disqualified juror's stead. Accordingly, the trial court had no choice but to declare a mistrial, having found that Juror Pearce was "grossly unqualified" to continue serving as a juror.

On November 10, 1997, Mikel, through counsel, filed a petition in the Appellate Division, Fourth Department, of New York State Supreme Court seeking a writ of prohibition pursuant to Article 78 of New York's Civil Practice Law and Rules. In particular, Mikel sought to bar a third trial on Double Jeopardy grounds, arguing that the mistrial had been declared in the absence of "manifest necessity." On April 29, 1999, the Appellate Division dismissed the petition finding that the "record established that a sworn juror was properly discharged because she failed to answer questions truthfully during *voir dire* and ignored the instructions of the Court." *Mikel v. Mark*, 249 A.D.2d 993, 672 N.Y.S.2d 1 (App. Div. 4th Dept. 1998).  The New York Court of Appeals dismissed Mikel's appeal. *Mikel v. Mark*, 92 N.Y.2d 873, 700 N.E.2d

---

[4]    Section 270.35(1) provides in relevant part as follows:
If at any time after the trial jury has been sworn and before the rendition of its verdict, a juror is unable to continue serving by reason of illness or other incapacity, or for any other reason is unavailable for continued service, or the court finds, from facts unknown at the time of the selection of the jury, that *a juror is grossly unqualified to serve in the case or has engaged in misconduct of a substantial nature*, but not warranting the declaration of a mistrial, the court must discharge such juror. . . . If no alternate juror is available, the court must declare a mistrial pursuant to subdivision three of section 280.10 [of New York's Criminal Procedure Law]. N.Y. Crim. Proc. Law § 270.35 (1) (emphasis supplied).


[5]    Section 280.10(3) provides that "[a]t any time during the trial, the court must declare a mistrial and order a new trial of the indictment under the following circumstances: . . . Upon motion of either party or upon the court's own motion, when it is physically impossible to proceed with the trial in conformity with law." N.Y. Crim. Proc. Law § 280.10(3). A "physical impossibility to proceed with the trial," within the meaning of C.P.L. § 280.10(3) arises when there exists insufficient number of sworn jurors.  *See Romero v. Justices of Supreme Court, Queens County*, 237 A.D.2d 292, 654 N.Y.S.2d 803 (App. Div. 2d Dept. 1997).

315, 677 N.Y.S.2d 776 (N.Y. 1998).

Mikel's third trial occurred in March of 1999, again before Justice Mark in Monroe County Supreme Court. Mikel was the only defendant, co-defendant Richardson having been acquitted at the second trial. The jury at the third trial returned a verdict convicted Mikel as charged. He was sentenced to two consecutive terms of twenty-five years to life for the second degree murder convictions; the sentences on his remaining convictions, which for shorter periods of time, were set to run concurrently to those for the murder conviction. The Appellate Division unanimously affirmed the conviction on March 21, 2003. Leave to appeal to the New York Court of Appeals was denied.

This habeas petition followed, in which Mikel raises one ground for relief–that his retrial was barred by the Double Jeopardy clause of the Fifth Amendment. *See* Petition (Docket No. 1); Petitioner's Memorandum of Law ("Pet'r Mem.") (Docket No. 2). For the reasons set forth below, the Court recommends that the petition be dismissed and that no Certificate of Appealability issue.

## III.   DISCUSSION

### A.   Standard of Review

To prevail under 28 U.S.C. § 2254, as amended by the Anti-terrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (1996), a petitioner seeking federal review of his conviction must demonstrate that the state court's adjudication of his federal constitutional claim resulted in a decision that was contrary to or involved an unreasonable application of clearly established Supreme Court precedent, or resulted in a decision that was based on an unreasonable factual determination in light of the evidence presented in state court.

*See* 28 U.S.C. § 2254(d)(1), (2); *Williams v. Taylor*, 529 U.S. 362, 375-76 (2000).

**B.      Analysis of Petitioner's Double Jeopardy Claim**

   **1.      Overview of Legal Principles**

   "A State may not put a defendant in jeopardy twice for the same offense." *Washington v.

Arizona*, 434 U.S. 497, 503 (1978) (citing *Benton v. Maryland*, 395 U.S. 784, 794 (1969)).

However, the double jeopardy clause of the Fifth Amendment does not bar retrial if there was

"manifest necessity" for the mistrial declared over the defendant's objection. *United States v.

Perez*, 9 Wheat. 579, 22 U.S. 579, 580, 6 L.Ed. 165 (1824); *accord, e.g.*, *Wade v. Hunter*, 336

U.S. 684, 690 (1949); *Crist v. Betz*, 437 U.S. 28, 35 n.10 (1978) ("The case [*Perez*] has long

been understood as standing for the proposition that jeopardy attached during the first trial, but

that despite the former jeopardy a second trial was not barred by the Double Jeopardy Clause

because there was a 'manifest necessity' for the discharge of the first jury.") (citations omitted);

*Illinois v. Somerville*, 410 U.S. 458, 461 (1973) ("The fountainhead decision construing the

Double Jeopardy Clause in the context of a declaration of a mistrial over a defendant's objection

is *United States v. Perez*[.]")). In *Perez*, Justice Story articulated the "flexible" formulation[6]

which consistently has been adhered to by the Supreme Court. As the court stated in *Somerville*,

the Justice Story's standard "abjures the application of any mechanical formula by which to

---

   [6]      "We think, that in all cases of this nature, the law has invested Courts of justice with the authority
to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into
consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated.
They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which
would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent
circumstances, and for very plain and obvious causes; and, in capital cases especially, Courts should be extremely
careful how they interfere with any of the chances of life, in favour of the prisoner. But, after all, they have the right
to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of
this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office." 9
Wheat at 580; quoted in *Washington*, 434 U.S. at 506 n. 18.

judge the propriety of declaring a mistrial in the varying and often unique situations arising

during the course of a criminal trial." 410 U.S. at 461. Furthermore, the Supreme Court has

consistently reiterated the "broad discretion reserved to the trial judge in such circumstances[.]"

*Id.*

  *Benton v. Maryland*, decided in 1969, held that the Fifth Amendment, and thus the double

jeopardy clause, was incorporated by reference in the Fourteenth Amendment and thus applicable

to the states. *See Benton*, 395 U.S. at 794; *accord*, *e.g.*, *United States v. Ng*, 699 F.2d 63, 70 (2d

Cir. 1983).  The New York Court of Appeals has recognized the "manifest necessity" standard

articulated in *United States v. Perez* and applied it in cases where a mistrial is granted without the

consent, or over the objection of, a defendant, to determine whether re-trial is barred by double

jeopardy considerations.  *E.g.*, *People v. Ferguson*, 67 N.Y.2d 383, 388 (N.Y. 1986) ("Where a

mistrial is granted without the consent or over the objection of a defendant, retrial is barred by

double jeopardy protections unless there was 'manifest necessity' for the mistrial or 'the ends of

public justice would otherwise be defeated[.]'") (quoting *United States v. Perez*, 9 Wheat at 580

and citing *Matter of Enright v. Siedlecki*, 59 N.Y.2d 195, 199 (N.Y. 1983); *United States v.

Dinitz*, 424 U.S. 600, 607 (1976)); *accord People v. Michael*, 48 N.Y.2d 1, 9 (N.Y. 1979)

("Where a court declares a mistrial without obtaining the defendant's consent the double

jeopardy provisions of both our State Constitution and the Federal Constitution prohibit retrial

for the same crime unless "there is a manifest necessity for [the mistrial], or the ends of public

justice would otherwise be defeated[.]"); *Davis v. Brown*, 87 N.Y.2d 626, 630 (N.Y. 1996).

These constitutional double jeopardy principles "have to some extent been codified" in New

York Criminal Procedure Law § 280.10(3), "which allows a court to declare a mistrial on its own

motion only 'when it is physically impossible to proceed with the trial in conformity with law.'"
*People v. Michael*, 48 N.Y.2d at 9 (quoting N.Y. Crim. Proc. Law § 280.10(3)). Section
280.10(3) comes into play when a juror has been dismissed, either because she is "grossly
unqualified" or has engaged in misconduct, and no alternate juror is available to serve. *See* N.Y.
Crim. Proc. Law § 270.35(1). In such a circumstance, the trial court must declare a mistrial
pursuant to C.P.L. § 280.10(3) because, without a full complement of twelve jurors, it is
"physically impossible" to proceed with the trial in conformity with New York state law, *see*
N.Y. Crim. Proc. Law § 280.10(3).  New York appellate courts have held that when a trial court
declares a mistrial after it has discharged a "grossly unqualified" juror and there are  no alternate
jurors available, a defendant's re-trial is not barred on double jeopardy grounds since there was
"manifest necessity" for the mistrial. *E.g.*, *People v. Garcia*, 215 A.D.2d 246, 246 (App. Div. 1st
Dept.) (citing *People v. Tinsley*, 58 N.Y.2d 990, 992 (N.Y. 1983); N.Y. Crim. Proc. Law §§
270.35 , 280.10(3))), *appeal denied*, 86 N.Y.2d 794 (N.Y. 1995). "Since the trial judge is in the
best position to determine whether a mistrial is in fact necessary in a particular case, that court is
entrusted with discretion in this area, and deference is to be accorded the trial judge's decision to
declare a mistrial[.]" *People v. Michael*, 48 N.Y.2d at 9 (citing *Matter of Napoli v. Supreme
Court*, 33 N.Y.2d 980, *aff'g on opn. below*, 40 A.D.2d 159, 338 N.Y.S.2d 721; *Arizona v.
Washington*, 434 U.S. at 513-14; *Gori v. United States*, 367 U.S. 364 (1961)).

    **2.**    **Petitioner's Arguments**

        **a.**    **The trial court failed to conform to the "legitimate and reasonable
state policy" of New York state and, therefore, denial of petitioner's
double jeopardy claim involved an unreasonable application of clearly
established Supreme Court precedent**

The first aspect of Mikel's double jeopardy argument asserts that Juror Pearce "was not discharged in accordance with the legitimate and reasonable state policy" of New York state regarding the declaration of mistrials pursuant to C.P.L. § 270.35(1) and then concludes that this alleged violation of "state policy" involved an "unreasonable application of clearly established constitutional law under United States Supreme Court precedent." Pet'r Mem. at 15 (Docket No. 2). Respondent contends that to the extent Mikel is asserting an error of state law, his claim is not cognizable as a federal constitutional claim on habeas review.

The Supreme Court has "stated many times" that "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire* (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) and citing *Pulley v. Harris*, 465 U.S. 37, 41 (1984)). In *McGuire*, the Supreme Court "reemphasized" that "it is not the province of a federal habeas court to reexamine state-court determinations of state-law questions." *Id.*; *accord*, *e.g.*, *Davis v. Strack*, 270 F.3d 111, 123 (2d Cir. 2001). Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* (reversing Ninth Circuit Court of Appeals which had granted habeas relief based on alleged evidentiary error; circuit court ruled that petitioner's due process rights were violated, relying in part on its conclusion that the evidence of prior injury to victim was "incorrectly admitted . . . pursuant to California law"; Supreme Court noted that "[s]uch an inquiry . . . [wa]s no part of a federal court's habeas review of a state conviction"); *see also Ayala v. Leonardo*, 20 F.3d 83, 94 (2d Cir. 1994) ("Further, while the admission of [unavailable witness] Everett's pre-trial *Wade* testimony was in violation of New York state evidentiary law, the error did not rise to the level of a federal constitutional violation" and thus habeas relief was not warranted.). The Court agrees with

respondent that to the extent Mikel is asserting a misapplication of New York State law, such a claim generally is not cognizable in the instant habeas proceeding. However, as the Second Circuit has observed, "[t]he fact that federal habeas corpus relief does not lie for errors of state law, does not mean, . . . , that errors under state law cannot result in cognizable violations of a constitutional right to due process. What due process requires will often depend on what state law is." *Davis v. Strack*, 270 F.3d at 123 (internal citations and quotation marks omitted). Although Mikel argues his first point mainly from the aspect New York state law, he also attempts to argue that this misapplication of state law constituted an unreasonable application of federal law. Accordingly, the Court believes that in these circumstances, it is necessary to address Mikel's argument touching on New York state law principles concerning the declaration of a mistrial in the event a juror is disqualified.

Section 270.35(1) codifies the procedure for removing a sworn juror over the objection of the defense in one of two circumstances–when the trial court finds that the juror is "grossly unqualified" of has "engaged in misconduct of a substantial nature." According to Mikel, the New York Court of Appeals has articulated a "bright line" rule that removal of a sworn juror as "grossly unqualified" requires a specific finding that it has become "obvious"–as opposed to merely "likely"– that the juror possesses a state of mind which would prevent the juror from rendering an impartial verdict. *Id.* (citing *People v. Buford*, 69 N.Y.2d 290, 298 (N.Y. 1987)). Mikel cites *People v. Rodriguez*, 100 N.Y.2d 30 (N.Y. 2003), for the proposition that, as a matter of New York law, a "juror's concealment of any information during *voir dire*" cannot lead to the "automatic disqualification" of that juror. *Id.* According to Mikel, the state courts erroneously applied an "automatic disqualification" rule to remove Juror Pearce on the basis that it believed

that "her deliberate failure to raise her hand and reveal her brother's criminal conviction (and that she visited the jail) in and of itself justified her removal from the jury." *Id.*

The Court agrees that Section 270.35 of New York's Criminal Procedure Law contemplates discharge of a juror in two circumstances–when the juror is "grossly unqualified to serve in the case" or "has engaged in misconduct of a substantial nature[.]" N.Y. Crim. Proc. Law § 270.35(1); *accord*, *e.g.*, *People v. Harris*, 99 N.Y.2d 202, 213 (N.Y. 2002). The trial court "should conduct a 'probing and tactful inquiry' into the facts of the situation and, in determining whether the juror's state of mind will bear upon his or her deliberations, should carefully weigh the juror's responses and demeanor[.]" *Harris*, 99 N.Y.2d at 213 (quoting *People v. Buford*, 69 N.Y.2d at 299 (analyzing C.P.L. § 270.35(1)) and citing *People v. Rodriguez*, 71 N.Y.2d 214, 219 (N.Y. 1988) (analyzing C.P.L. § 270.35(1)). In order to find that a juror is "grossly unqualified," the trial court "'must be convinced that the juror's knowledge will prevent her from rendering an impartial verdict[.]'" *Id.* (quoting *Buford*, 69 N.Y.2d at 299 and citing *People v. Johnson*, 87 N.Y.2d 1006, 1008 (N.Y. 1996)).

Mikel notes that the trial court's stated reason for discharging Juror Pearce was that she was "grossly unqualified" because she failed to give honest answers to questions on *voir dire* regarding whether a relative or anyone close to her had been charged with or convicted of a crime. Mikel goes on to argue that "New York policy, in the application of CPL 270.35(1), precludes automatic disqualification of a juror based on the juror's deliberate failure to reveal information during jury selection." Pet'r Mem. at 12 (Docket No. 2). Mikel cites to a 2003 case, *People v. Rodriguez*, 100 N.Y.2d 30, *supra*, for the proposition that "the New York rule has not been, nor will be, that 'a juror's concealment of any information during *voir dire*' creates

'automatic' disqualification." Pet'r Mem. at 11 (Docket No. 2) (citing *Rodriguez*, 100 N.Y.2d at 34).

As Mikel concedes, the 2003 case of *People v. Rodriguez* did *not* arise in the context of a mistrial declared pursuant to C.P.L. § 270.35(1); rather, the defendant in that case had moved for a new trial under C.P.L. § 330.30. Soon after the verdict, one of the jurors, contacted a New York County Assistant District Attorney ("A.D.A.") with whom he had previously been acquainted. The juror told the A.D.A. that he had served as a juror on defendant Rodriguez's trial and had intentionally concealed that he and the A.D.A. knew each other. The A.D.A. immediately reported the conversation to the prosecuting attorney, who in turn disclosed it to the court and defense counsel. In response to defendant Rodriguez's motion to set aside the verdict pursuant to C.P.L. § 330.30, the trial court conducted a hearing at which the juror and the A.D.A. testified. The trial court credited both individuals' testimony that their relationship was "remote," and that the juror's sole reason for wanting to remain on the jury was his desire to serve on a short trial. Satisfied that the juror's lack of disclosure worked no prejudice against defendant Rodriguez, the court denied the motion. The Appellate Division affirmed, agreeing with the trial court that the juror's concealment of information during *voir dire* did not cause any prejudice that would entitle defendant to a new trial.

On appeal to the New York Court of Appeals, defendant Rodriguez urged that he was denied his right under the State Constitution to a fair and impartial jury chosen with his participation; in particular, he contended that he was denied a voice in the selection of the jury because the juror's concealment of information deprived him of the opportunity to question the juror more fully and possibly remove him from the jury. The New York Court of Appeals stated

that contrary to defendant Rodriguez's contentions, it had "never held that a juror's concealment of any information during *voir dire* is by itself cause for automatic reversal." 100 N.Y.2d at 34. This statement from *Rodriguez*, 100 N.Y.2d at 34, is inapposite to the present case for several reasons. First, *Rodriguez* dealt with a motion to vacate the judgment pursuant to C.P.L. § 330.30, not with the declaration of a mistrial by the trial court pursuant to C.P.L. § 270.35(1). The Court notes that Mikel has taken the phrase "grounds for automatic reversal" from *People v. Rodriguez* and has subtly morphed it into what he refers to as a proscription against "automatic disqualification." Presumably, this was done in an attempt to make *People v. Rodriguez*, 100 N.Y.2d 30, appear relevant to his case. That case of *People v. Rodriguez* had nothing whatsoever to do with juror disqualification under C.P.L. § 270.35(1). In fact, the New York Court of Appeals explicitly rejected defendant Rodriguez's attempt to argue his point based on cases which did involve C.P.L. § 270.35(1) because in those cases, the result turned on whether the juror in question was "grossly unqualified" to serve, a determination that was not at issue in *People v. Rodriguez*, 100 N.Y.2d at 34.

Furthermore, the Court is not convinced that Mikel's logic is sound–simply because the trial court in this case found that Juror Pearce's intentional concealment of information during *voir dire* was grounds for determining that she was "grossly unqualified" to continue to serve on his jury did not mean that the trial court "automatically" disqualified her after learning that she may have withheld information during *voir dire*. Mikel's argument appears to be that the trial court must have employed a so-called "automatic disqualification rule" because its stated reasons for dismissing Juror Pearce had to do with the fact that she did not answer honestly during *voir dire* when the trial court asked the panel whether they or anyone close to them had been

convicted of a crime. However, Mikel has offered no precedent that stands for the proposition that a juror's concealment of information or perjury may *not* serve as the factual predicate for a finding that he or she is "grossly unqualified" for purposes of the trial court declaring a mistrial pursuant to C.P.L. §§ 270.35(1), 280.10(3). To the contrary, appellate courts in New York have upheld a finding by the trial court that a juror was "grossly disqualified" due to the fact that the juror had lied to the trial court. *See People v. De La Rosa*, 650 N.Y.S.2d 641, 642 (App. Div. 1st Dept. 1996) (holding that trial court's discharge of juror, over defense objection, as grossly unqualified to serve, and for engaging in misconduct of substantial nature, was warranted, where juror engaged in flirtatious conduct with co-defendant's sister and then lied about it to court), *appeal denied*, 89 N.Y.2d 942 (N.Y 1997); *accord People v. Pizarro*, 24 A.D.3d 309 (App. Div. 1st Dept. 2005) ("[T]his Court has held that when a juror both commits sufficiently serious misconduct and lies to the court about the commission of such misconduct, the juror both is 'grossly unqualified to serve' and has 'engaged in misconduct of a substantial nature[.]'"); *see also People v. Boston*, 182 A.D.2d 494 (App. Div. 1st Dept. 1992) (the trial court discharged the juror as grossly unqualified pursuant to C.P.L. § 270.35, finding that she was in "emotional turmoil over her boyfriend's plight" (he had just been arrested while on parole), and that during the initial *voir dire* she "withheld information" that her boyfriend had prior felony convictions; the appellate court found "no basis to disturb this result, the juror having withheld material facts pertinent to whether she should be challenged for cause") (citing *People v. Pauley*, 281 A.D. 223 (App. Div. 4th Dept. 1953) (reversing conviction where "[t]he answers given by the juror upon the *voir dire* examination were misleading, evasive and false"; "defendants were entitled to a full and fair disclosure of the facts without which they could not determine whether to accept or

-18-

reject her"); *People v. Howard*, 66 A.D.2d 670 (App. Div. 1st Dept. 1978) (reversing conviction

on basis that jury was not fair and impartial where, after the verdict, it was discovered that a juror

had been a registered police informant working with the district attorney's office in the

investigation of gambling, that the juror had been a gambler unable to pay his debts and had

become an informant because he needed police protection from the bookmakers to whom he

owed money; juror had been asked on *voir dire* whether he had ever been "connected with any

law enforcement agency").

      Moreover, a review of the transcript in this matter provides no basis for arguing that Juror

Pearce was "automatically disqualified," to use Mikel's phrase, once she revealed that she had

not provided truthful answers during *voir dire*. To the contrary, the trial judge conducted a

probing and thorough inquiry into what facts about herself Juror Pearce had not disclosed, and

discovered that the juror's brother, some thirteen years prior to Mikel's trial, had been tried and

convicted by the Monroe County District Attorney's Office on charges of murder. The trial court

did not make the decision to declare mistrial until after he, and the attorneys, had extensively

questioned Juror Pearce. The inquiry revealed that Juror Pearce believed that the police had

engaged in misconduct during the investigation and arrest of her brother, and that she believed

that her brother was innocent. The juror admitted that she deliberately chose to withhold this

information during *voir dire*. As discussed above, there is precedent in New York's case law for

finding that such actions by a juror render her "grossly unqualified" as well as constitute

"substantial misconduct." *See*, *e.g.*, *People v. Pizarro*, 24 A.D.3d 309, *supra*.

      Finally, Mikel has ignored the consistent instruction of the New York Court of Appeals

that the "Trial Judge generally is accorded latitude in making the findings necessary to determine

whether a juror is grossly unqualified under C.P.L. 270.35, because that Judge is in the best position to assess partiality in an allegedly biased juror[.]" *People v. Rodriguez*, 71 N.Y.2d at 219 (citing *People v. Michael*, 48 N.Y.2d at 10). To support his contention that the trial court acted outside the bounds of his discretion, Mikel relies heavily on Juror Pearce's negative response to defense counsel's questions to the effect of whether she thought that her brother's past conviction "would have any impact on [her] ability to sit as a fair and impartial juror[.]" However, the trial court was not bound by Juror Pearce's curt denial that her brother's experiences would prevent her from being a fair and impartial juror, given her explicitly stated feelings that her brother had been treated unfairly by the police, and her detailed recitation of all the things that the police had done wrong in his case. *See People v. Pizarro*, 24 A.D.3d at 316-17  ("The assurances the court received from [juror] Navarro [that he would restrict himself to consideration of the evidence at trial], however, stand on a much different footing. In the first place, a juror who engages in misconduct of any sort provides reason to view with some skepticism his veracity as well as his impartiality. The commission of misconduct of the magnitude with which Navarro was accused–seeking to impart to other jurors personal knowledge about the case in flagrant disregard of the court's rulings and his sworn obligations, even putting aside his possible concealment of that knowledge during voir dire–would provide a powerful additional reason to view with considerable cynicism any assurances of impartiality.").

The other focus of Mikel's argument appears to derive from this language in *People v. Buford*: "[T]he standard for disqualifying a sworn juror over defendant's objection (*i.e.*, "grossly unqualified") is satisfied only 'when it becomes *obvious* that a particular juror possesses a state of mind which would prevent the rendering of an impartial verdict[.]'" *People v. Buford*, 69

-20-

N.Y.2d at 298 (quoting *People v. West*, 92 A.D.2d 620 (App. Div. 3d Dept. 1983) (dissenting

opn.), *rev'd for reasons stated in dissenting opn.*, 62 N.Y.2d 708 (N.Y. 1984) (emphasis

supplied)).  According to Mikel, the New York Court of Appeals therefore has articulated a

"bright line" rule that removal of a sworn juror as "grossly unqualified" requires a specific

finding that it has become "obvious"–as opposed to merely "likely"–that the juror possesses a

state of mind which would prevent the juror from rendering an impartial verdict. *Id.* (citing

*People v. Buford*, 69 N.Y.2d at 298). Mikel appears to be faulting the trial judge for failing to

utter words to the effect that it was "obvious" to him that she was unable to be impartial. *See*

Pet'r Mem. at 13 (Docket No. 2). Mikel complains that the "record contains no indication

whatsoever that the trial judge was truly convinced of her 'obvious' bias. Indeed, in the fact of

the juror's insistence on her impartiality, the trial judge retreated to an automatic disqualification

rule." Pet'r Mem. at 13 (Docket No. 2).

   The Court already has explained its disagreement with Mikel's contention that the trial

court applied a so-called "automatic disqualification rule." It turns now to Mikel's apparent

contention that the trial court failed "to find convincing proof of Juror Pearce's 'obvious' bias[.]"

Pet'r Mem. at 14 (Docket No. 2). The Court notes with interest Mikel's attempt to distinguish

*Arizona v. Washington*, in which the district court and circuit court of appeals had granted the

writ on double jeopardy grounds based on the trial court's failure to specifically indicate that it

was declaring a mistrial out of "manifest necessity." The Supreme Court reversed, holding that

the lower courts had "attached undue significance to the form of the ruling." *Id.* at 503. Mikel

argues that in his case, "we are dealing with much more than the 'mere form of the ruling.'" Pet'r

Mem. at 14. Mikel goes on to assert that "[t]here is no question that, had Juror Pearce been

properly removed under the constraint of state policy, a mistrial declaration would have been mandatory under state law (CPL 280.10(3)) and Mr. Mikel does not take issue with the state courts' failure to specifically employ the words 'manifest necessity.'" *Id.*

Mikel asserts that what transpired in his case is "readily distinguishable" from the facts of *Arizona v. Washington* because in his case, "the state judiciary did not adhere to its own law and the failure to find convincing proof of Juror Pearce's 'obvious' bias was a direct result of the failure to adhere to state policy." Mikel contends that the "state judiciary [sic] failed to make the requisite finding because it wrongly believed that such finding was not required by state law and that a lesser standard sufficed to dismiss the juror." This Court is not convinced by Mikel's dissection.

*Arizona v. Washington* involved the declaration of a mistrial on the basis of juror bias. The trial judge granted the prosecutor's motion for a mistrial predicated on improper and prejudicial comment during defense counsel's opening statement. 434 U.S. at 498; *see also id.* at 510. The questions presented to the Supreme Court were "whether the record reflect[ed] the kind of 'necessity' for the mistrial ruling" so as to avoid a valid plea of double jeopardy, and if so, whether the plea must nevertheless be allowed because the trial judge "did not fully explain the reasons for his mistrial ruling." *Id.* at 498. During his opening statement, defense counsel had referred to prosecutorial misconduct that had occurred at the previous trial; notwithstanding his contention that such evidence was admissible, he never offered any state law precedent supportive of his argument. *See id.* at 511. With that in mind, the Supreme Court "start[ed] from the premise that defense counsel's comment was improper and may have affected the impartiality of the jury." *Id.*

-22-

The Supreme Court began by noting that the "overriding interest in the evenhanded administration of justice requires that [it] accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected[.]" *Id.* at 511; *see also id.* at 512 (citing *Simmons v. United States*, 142 U.S. 148 (1891)). *Simmons* involved the "possibility of bias" occasioned by a newspaper article describing a letter written by defense counsel denying a charge by a third party that one of the jurors was acquainted with the defendant. The trial judge in *Simmons* did not determine the truth or falsity of the charge, nor did he examine the jurors to ascertain what effect the story had upon them; rather, the judge declared a mistrial because he considered it "'impossible that in the future consideration of this case by the jury there can be that true independence and freedom of action on the part of each juror which is necessary to a fair trial of the accused.'" *Id.* (quoting *Simmons*, 142 U.S. at 150). The Supreme Court affirmed, holding that the judge was justified in finding that the letter's publication had made it "impossible for the jury 'to act with the independence and freedom on the part of each juror requisite to a fair trial of the issue between the parties.'" *Id.* (quoting *Simmons*, 142 U.S. at 155).

The Supreme Court in *Washington* then identified "compelling institutional considerations militating in favor of appellate deference to the trial judge's evaluation of the significance of possible juror bias." *Id.* at 513. Chief among them were the trial judge's ability to see and hear the jurors during *voir dire* and his familiarity with the evidence in the case. In short, the Supreme Court stated, the trial judge is "far more 'conversant'" with factors relevant to determining juror bias than any reviewing court could ever be. *Id.* (quoting *Wade v. Hunter*, 336 U.S. 684, 687 (1949)). Nevertheless, the "great deference" to which a trial judge's decisions

entitled may be overcome if the reviewing courts are not satisfied that the trial judge did not

exercise "'sound discretion' in declaring a mistrial." *Id.* at 514 (quotation omitted).

The Supreme Court in *Washington* stated that if a trial judge acts "irrationally or

irresponsibly," his decision to declare mistrial cannot stand. *See id.* However, the court did not

articulate a strict formula to be followed in determining whether the trial judge has exercised

"sound discretion" in declaring a mistrial. In finding that the trial judge in *Washington* had

exercised "sound discretion," the Supreme Court noted that the judge "did not act precipitately in

response to the prosecutor's request for a mistrial" but rather, concerned about the possible

double jeopardy consequences of an erroneous ruling, allowed both defense counsel and the

prosecutor a "full opportunity to explain their positions on the propriety of a mistrial." *Id.* at 515.

Based on the trial record, the Supreme Court was persuaded that "the trial judge acted

responsibly and deliberately, and accorded careful consideration to respondent's interest in

having the trial concluded in a single proceeding." *Id.* "Since [the trial judge] exercised 'sound

discretion' in handling the sensitive problem of possible juror bias created by the improper

comment of defense counsel, the mistrial order is supported by the 'high degree' of necessity

which is required in a case of this kind." *Id.* (footnote omitted). The Supreme Court observed that

neither the defendant nor the prosecutor has a right to have his case "decided by a jury which

may be tainted by bias[.]" *Id.* (footnote omitted).

Finally, the Supreme Court held that, to the extent the lower courts found the absence of

an explicit finding of "manifest necessity" to be determinative, "they required too much." *Id.* at

516.  The Supreme Court explained that since the record provided "sufficient justification" for

the state court's ruling, "the failure to explain that ruling more completely [did] not render it

constitutionally defective." *Id.* at 517; *see also id.* ("The state trial judge's mistrial declaration is not subject to collateral attack in a federal court simply because he failed to find 'manifest necessity' in those words or to articulate on the record all the factors which informed the deliberate exercise of his discretion.").

Mikel has offered no state law supporting his contention that the trial court must make an explicit finding of "obviousness" on the record. Furthermore, as has been made clear in the foregoing paragraphs, *Arizona v. Washington* is clearly established Supreme Court precedent eschewing any such requirement that the trial court utter verbal "talismans" when declaring a mistrial. The Court thus is hard-pressed to see how the Appellate Division's rejection of his double jeopardy claim was an incorrect application of clearly established federal law, let alone an unreasonable one.

As in *Washington*, the trial court here did not act precipitately, but instead engaged Juror Pearce in a lengthy colloquy, eliciting information that her brother had been convicted of murder some thirteen years prior to Mikel's trial, and that she believed her brother was innocent and had been wrongly prosecuted by the Monroe County District Attorney's Office after an investigation in which the Rochester Police Department allegedly committed misconduct. Juror Pearce admitted that she deliberately chose not to reveal these facts during *voir dire*, giving as her reason that she did not think it was important. Even on a cold record, that statement does have the faintest ring of truthfulness or candor. Furthermore, it is clear from her responses to the court's questioning that Juror Pearce did not believe she had done anything wrong, which leads to the inference that she also believed herself to be beyond the authority of the trial court. The judge then allowed both the prosecutor and defense counsel to question Juror Pearce and after

-25-

she was sent back to the jury room, to argue the propriety of her dismissal. Thus, it is apparent that the trial judge did not act "precipitately" here but instead conducted a careful and thorough inquiry into the issue.

The Court now turns to the degree of "necessity" for the mistrial in Mikel's case. In *Washington v. Arizona*, the Supreme Court placed different precipitating events for a mistrial along a spectrum: at one extreme is the situation where, for instance, there is reason to believe that the prosecutor is "using the superior resources of the State to harass or to achieve a tactical advantage over the accused[,]" 434 U.S. at 508, while at the other is "the mistrial premised upon the trial judge's belief that the jury is unable to reach a verdict," *id.* at 509. In the former circumstance, "the strictest scrutiny is appropriate[,]" *id.* at 508; in the latter, the trial judge is "allow[ed] . . . to exercise broad discretion[,]" *id.* at 509. In *Washington*, the problem was one of possible juror bias; the Supreme Court stated that along the spectrum of trial problems, it fell "in an area where the trial judge's determination is entitled to special respect." *Id.* at 510.

It is beyond question that juror perjury is a serious matter indeed. In fact, in *Clark v. United States*, 289 U.S. 1 (1933), the Supreme Court upheld a conviction for contempt based on a juror's perjury during *voir dire*. *Dyer v. Calderon*, 151 F.3d 970 (9th Cir.) (*en banc*), *cert. denied*, 525 U.S. 1033 (1998), a case on federal habeas in which the petitioner had moved for a new trial on the basis of juror perjury and bias, is instructive. In that case, it had come to light after the verdict that one of the jurors had lied during *voir dire* about her background; petitioner argued that her lies were evidence of actual bias and reversal of his murder conviction was warranted. The juror in question in *Dyer* had committed mendacities on *voir dire* similar in nature to those of Juror Pearce. In particular, the juror gave a negative answer to the question of

-26-

whether any of her relatives had ever been the victim of any type of crime, despite the shooting

death of her brother under circumstances factually similar to the crime for which petitioner Dyer

had been on trial, and evidence that the juror had expressed strong views about her brother's

killing.  The Ninth Circuit resolved the case under the rubric of "implied bias" and found that

facts "add[ed] up to that rare case where [it] must presume juror bias." The Ninth Circuit found

critical that "[a]fter watching a number of potential jurors disclose relatively minor crimes and

get dismissed, she chose to conceal a very major crime–the killing of her brother in a way that

she knew was very similar to the way Dyer was accused of killing his victims." In addition, the

juror failed to disclose many other facts that would have jeopardized her chances of serving on

Dyer's jury–namely, that she had been a victim of numerous burglaries, and that almost all of her

close relatives, including her husband, had been convicted of crimes. Later on, when she was

questioned about her brother's death, she lied once again by pretending she thought it was an

accident, and by telling the judge that no one in her family had testified about the killing. From

those statements, the inference the Ninth Circuit drew was that the juror "lied in order to preserve

her status as a juror and to secure the right to pass on Dyer's sentence." The Ninth Circuit

eloquently described the manner in which a juror untruthful about material issues fatally

undermines the integrity of the trial process itself:

> A juror . . . who lies materially and repeatedly in response to legitimate inquiries
> about her background introduces destructive uncertainties into the process. There
> is, of course, the possibility that she did so because of some personal bias against
> the defendant which she managed to hide from the court. But a perjured juror is
> unfit to serve even in the absence of such vindictive bias. If a juror treats with
> contempt the court's admonition to answer *voir dire* questions truthfully, she can
> be expected to treat her responsibilities as a juror–to listen to the evidence, not to
> consider extrinsic facts, to follow the judge's instructions–with equal scorn.
> Moreover, a juror who tells major lies creates a serious conundrum for the

fact-finding process. How can someone who herself does not comply with the duty to tell the truth stand in judgment of other people's veracity? Having committed perjury, she may believe that the witnesses also feel no obligation to tell the truth and decide the case based on her prejudices rather than the testimony.

*Dyer v. Calderon*, 151 F.3d at 983.

The Court finds that in the present case, the nature of Juror Pearce's perjury was such as to create grave doubts about her impartiality. As in *Washington v. Arizona*, the trial problem here was one of juror bias–on this record, it appears to this Court that the juror bias was "probable," not just "possible." Therefore, the situation here falls in the area where the trial judge's determination on the propriety of a mistrial is entitled to deference. *See Washington*, 434 U.S. at 510. Based on the record, the Court has no difficulty concluding that the mistrial order was supported by the "high degree" of necessity required in a case involving potential juror bias, *see id.* at 515. As the Supreme Court stated in *Washington*, "[n]either party has a right to have his case decided by a jury which may be tainted by bias; in these circumstances, 'the public's interest in fair trial designed to end in just judgements' must prevail over the defendant's 'valued right' to have his trial concluded before the first jury impaneled." *Id.* (footnotes omitted). Furthermore, to the extent that Mikel is arguing that the record does not reflect "actual" or "obvious" juror bias since Juror Pearce insisted that she was being impartial, the soundness of the trial judge's decision is not dependent upon such a showing. *See United States v. Spears*, 89 F. Supp.2d 891, 897 (W.D. Mich. 2000) ("The manifest necessity determination must be upheld if there is a sound basis in the record for his conclusion that the jurors might have been influenced by improper considerations.") (citing *Washington*, 434 U.S. at 511-12 (absent showing of actual

bias, mistrial justified by possibility of bias); *United States v. Sisk*, 619 F.2d 1174, 1180 (6th Cir. 1980) (despite jurors' expressed confidence in ability to weigh evidence fairly, mistrial justified by possibility of outside influence)).

Having thoroughly reviewed the record, the Court is convinced that it provides ample support for the state courts' determination that Juror Pearce was "grossly unqualified" because she failed to answer questions truthfully during *voir dire* and ignored the instructions of the trial court. In sum, Mikel has not demonstrated that there was any error of state law in the trial court's inquiry into Juror Pearce's fitness to continue to serve on the jury and its ultimate finding that she was "grossly disqualified" because she had lied, with the intent to withhold information from the court, during *voir dire.* To the contrary, the procedure followed by the trial court and its declaration of a mistrial appear to have been fully in accordance with New York state law and supported by the trial record. Moreover, there was no error of federal constitutional law, as the state trial court's inquiry into Juror Pearce's perjury and possible bias, and its declaration of a mistrial as a result of these findings, was in line with clearly established Supreme Court precedent as set forth, *e.g.*, in *Washington v. Arizona*. The necessity for a mistrial in Mikel's case was "manifest," as that term has been interpreted by the Supreme Court in *Washington v. Arizona*,[7] such that the re-trial here was not barred by the Fifth Amendment's double jeopardy clause. Accordingly, the Court recommends that habeas relief be denied on the first aspect of

---

[7] "The words 'manifest necessity' appropriately characterize the magnitude of the prosecutor's burden. For that reason Mr. Justice Story's classic formulation of the test has been quoted over and over again to provide guidance in the decision of a wide variety of cases. Nevertheless, those words do not describe a standard that can be applied mechanically or without attention to the particular problem confronting the trial judge. Indeed, it is manifest that the key word 'necessity' cannot be interpreted literally; instead . . . we assume that there are degrees of necessity and we require a 'high degree' before concluding that a mistrial is appropriate." *Washington*, 434 U.S. at 505-06 (footnotes omitted).

petitioner's double jeopardy claim.

> **b.** **The state court's findings of fact as to the juror's bias were unreasonable**

In the second part of his argument, Mikel asserts that the state courts' decisions should have been "guided by whether the trial judge found convincing proof of Juror Pearce's 'obvious' (as opposed to 'likely') inability to be impartial." Pet'r Mem. at 15 (Docket No. 2) (citing *People v. Buford*, 69 N.Y.2d at 298). According to Mikel, even if the *Buford* standard was employed by the trial judge, which he does not concede, "any finding of fact that convincing proof existed to show that Juror Pearce's mind was infected with 'obvious' bias need be deemed unreasonable." *Id.* (Docket No. 2) (citation omitted); *see also* 28 U.S.C. § 2254(d)(2). Mikel appears to be arguing that any "unreasonableness" in the trial court's factual findings lies in the fact that, according to Mikel, Juror Pearce "repeatedly avowed that such knowledge [of her brother's murder conviction] did not render her incapable of being an impartial juror." *Id.* at 16 (Docket No. 2).

As an initial matter, federal law does not require a specific finding that the juror's bias is "actual" or "obvious" before a mistrial can be declared. *See United States v. Spears*, 89 F. Supp.2d at 897 ("The manifest necessity determination must be upheld if there is a sound basis in the record for his conclusion that the jurors might have been influenced by improper considerations.") (citing *Washington*, 434 U.S. at 511-12 (absent showing of actual bias, mistrial justified by possibility of bias); *United States v. Sisk*, 619 F.2d at 1180 (despite jurors' expressed confidence in ability to weigh evidence fairly, mistrial justified by possibility of outside influence)). Furthermore, where there is evidence of juror having lied or withheld information, a

juror's insistence on her ability to be impartial does not bind a trial judge to agree and therefore

conclude that the juror's deliberations will not be tainted by bias. *See Dyer v. Calderon*, *supra*.

Moreover, assuming for the sake of argument that "obvious" bias must be demonstrable

on the record, the Court does not agree with Mikel's contention that there was no "convincing

proof of 'obvious' bias[.]" Pet'r Mem. at 16 (Docket No. 2).  Not only did Juror Pearce conceal

information critical to her qualifications to sit as a juror, she also appeared to use the information

in the deliberation room against the prosecution and in favor of the defendant by appearing to

argue against conviction using her personal experience with her brother's case as support.

Accordingly, the trial judge was reasonable in inferring bias on the part of Juror Pearce.

Furthermore, one of the cases that Mikel has cited, *People v. Cannady*, 138 A.D.2d 616

(App. Div. 2d Dept.), *appeal denied*, 71 N.Y.2d 1024 (N.Y. 1988), does not actually support his

argument. In *People v. Cannady*, an *in camera* inquiry of a seated juror established that the juror

had discussed, with unsworn members of the jury pool, her views of police brutality and police

conduct in stopping motorists, despite the trial court's instruction that she not discuss the case

with anyone. In addition, the inquiry showed that the jury had withheld those views from the trial

court and the lawyers on *voir dire*. Finally, the juror declared that she would not apprise the trial

court of her views, but instead would withhold her views until she needed them. Although the

sworn juror stated that she "believed she could be impartial" and she "denied that she was

withholding the information," the trial court found that the "juror's conduct and evasive

demeanor indicated otherwise[.]" Accordingly, the trial court removed her, finding that she had

'engaged in misconduct of a substantial nature[.]'" *Id.* (quoting N.Y. Crim. Proc. Law § 270.35).

On appeal, the appellate division concluded that the trial court did not abuse its discretion in

replacing the seated juror with the first alternate juror since the removed juror certainly had

"engaged in substantial misconduct." *Id.* The appellate division further found that the juror's

"conduct ma[de] it *obvious* that she would have been unable to make a fair and impartial

assessment of the police testimony which was pivotal in this case[.]" *Id.* (citing, *inter alia*,

*People v. Buford*, 69 NY2d at 298) (emphasis supplied). Clearly, then, a juror's averments of her

ability to be impartial do not preclude a finding that she is "obviously" unable to be impartial.

*See id.* Thus, on facts considerably less egregious than those presented here, the state courts in

*People v. Cannady* found that the juror's inability to be fair and impartial, in fact, was obvious.

In asserting that the state courts' factual findings in his case were unreasonable, Mikel has

ignored the role that the trial judge's assessment of credibility and demeanor plays in this inquiry.

He suggests that the trial judge was bound to accept, at face value, Juror Pearce's assertions,

notwithstanding the revelation that she had lied, deliberately withholding information under oath.

Not only does this fly in the face of common sense, it is not required by the law, state or federal.

None of the state courts' factual findings were "unreasonable" given the record as it was

developed; to the contrary, the record provides strong support for the conclusions reached by the

state courts in this case. Accordingly, this Court recommends that habeas relief be denied on the

second aspect of petitioner's double jeopardy claim.

## IV.    CONCLUSION

For the reasons set forth above, the Court recommends that the petition for a writ of

habeas corpus filed by Lawrence Mikel be **DENIED**. Furthermore, the Court believes that Mikel

has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C.

§ 2253(c)(2). Therefore, the Court recommends that no Certificate of Appealability should issue

with respect to any of Mikel's claims.

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: March 5, 2007
       Rochester, New York.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72.3(a)(3).

The district court ordinarily will refuse to consider on *de novo* review arguments, case law and evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985, 990-91 (1ˢᵗ Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: Rochester, New York
March <u>5</u>, 2007.